# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CAREY J. HALKIOTIS,

    Plaintiff,

    v.

WMC MORTGAGE CORP., et al.,

    Defendants.

No. 3:12-cv-01507 (MPS)

## MEMORANDUM OF DECISION

*Pro se* Plaintiff Carey J. Halkiotis asserts claims against Defendant Saxon Mortgage Services, Inc. ("Saxon"), arising out of the parties' mortgage agreement.[1]  The Amended Complaint (ECF No. 86) sets forth the following claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), (4) violation of the Connecticut Creditors' Collection Practices Act ("CCPA"), (5) violation of the Federal Debt Collection Practices Act ("FDCPA"), and (6) trespass.  The core of Halkiotis's lawsuit is that Saxon misapplied his monthly payments during the time it serviced his loan, which forced him to incur extra fees, damaged his credit rating, and caused him emotional distress.  He also claims that Saxon is responsible for damage done by a company that Saxon hired to secure the property when it mistakenly believed Halkiotis had abandoned the property.  Saxon has moved for summary judgment on all counts, arguing that it was entitled to hold in suspense or reject Halkiotis's payments because they were insufficient and that it cannot be held liable for the property damage because the company it hired was an independent contractor and, alternatively, no trespass occurred.  (ECF No. 95.)  Because a

---

[1] Halkiotis's amended complaint also asserts claims against WMC Mortgage Corp., Ocwen Loan Servicing, LLC, and Deutsche Bank National Trust Co.  On March 12, 2015, this Court granted summary judgment in favor of Defendants Ocwen and Deutsche Bank on all counts.  (ECF No. 128.)  WMC has not appeared in this case.

genuine dispute of material fact exists as to a limited contention concerning a single payment, I

DENY summary judgment as to a minor portion of the breach of contract claim (Count One).

Because there is a genuine dispute as to whether Saxon reasonably determined that Halkiotis had

abandoned his property, I DENY summary judgment as to the trespass claim (Count Six).  I

GRANT summary judgment as to all remaining claims (most of Count One and Counts Two

through Five).

## I.    Background

Unless indicated otherwise, the following facts are undisputed according to the parties'

Local Rule 56(a) statements.[2]

### A.  *Original Mortgage Agreement and Forced Placed Insurance Policy*

In connection with his purchase of a property in Washington, Connecticut, Halkiotis

signed an adjustable interest rate note with WMC Mortgage Corporation ("WMC") in exchange

for a loan with a principal balance of $398,060.00, secured by a mortgage, on September 9,

2005.  (Def.'s SOF, ECF No. 96, ¶ 1.)  Chase Home Finance ("Chase") was responsible for

servicing the loan, but on May 31, 2007, Chase transferred its servicing rights to Saxon.  (*Id.* at ¶

11.)  Saxon held the servicing rights to Halkiotis's loan until November 16, 2009, when it

transferred the servicing rights to Ocwen Loan Servicing, LLC ("Ocwen").  (*Id.* at ¶ 56.)

---

[2] Despite multiple instructions that he adhere to Local Rule 56(a), Halkiotis has failed to comply with his obligations under that rule.  Halkiotis's Local Rule 56 Statement does not include a "Disputed Issues of Material Fact" section that lists each issue of material fact as to which he contends there is a genuine issue to be tried.  His submissions also fail to adhere to the "specific citation" obligation in Local Rule 56(a)(3): "The 'specific citation' obligation of this Local Rule requires counsel and *pro se* parties to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length."  Local Rule 56(a)(3) empowers this Court to sanction Halkiotis for failure to comply with these instructions.  Given Halkiotis's *pro se* status, however, this Court will consider Halkiotis's arguments in opposition to Saxon's motion to the extent that Halkiotis provides admissible evidence raising a genuine issue of material fact.  *See Wilks v. Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 185–86 (D. Conn. 2007) (considering a *pro se* plaintiff's opposition to defendant's summary judgment motion despite the plaintiff's failure to comply with Local Rule 56(a)).

Several provisions of the Mortgage Agreement are pertinent here.[3]  First, if Halkiotis submitted an insufficient amount in a monthly payment, Saxon could reject the payment or hold it in suspense.  (Def.'s MSJ, Ex. 1-B ("Mortgage Agreement") § 1.)  Second, Halkiotis was responsible for paying, in addition to amounts for principal and interest, monthly "Escrow Funds" for payments relating to, among other costs, property taxes and insurance premiums.  (*Id.* at § 3.)  Third, Halkiotis was responsible for maintaining insurance protecting the property against damage.  (*Id.* at § 5.)  If Halkiotis failed to maintain such insurance coverage, Saxon could purchase the insurance of its choice and charge Halkiotis for the cost of the "forced placed" policy.  (*Id.*)  Finally, if Halkiotis failed to adhere to his obligations under the Mortgage Agreement or abandoned the property, Saxon could take reasonable and appropriate actions to protect its interest in the property, including making repairs and changing the locks.  (*Id.* at § 9.)

Upon receiving the servicing rights to Halkiotis's mortgage, Saxon incorrectly deemed Halkiotis to be in default.  (Def.'s SOF ¶¶ 12–14; Pl.'s SOF, ECF No. 118, ¶¶ 12–14.)  On August 20, 2007, after receiving information demonstrating that Halkiotis was not in default, Saxon corrected Halkiotis's account status and waived "any fees assessed to his account."  (Def.'s SOF ¶ 14.)  Saxon also sent a "correction [letter] to the national bureaus advising them to remove any derogatory credit reporting information."  (*Id.* at ¶ 15; *see* Def.'s MSJ Ex. 1-G.)[4]

As noted, the Mortgage Agreement required that Halkiotis's property be covered by hazard insurance.  (*See* Mortgage Agreement § 5.)  Saxon sent Halkiotis a letter, dated September 20, 2007, requesting that Halkiotis include Saxon's "Mortgage-Payee Clause" on his insurance policy.  (Def.'s MSJ Ex. 1-H.)  Saxon also requested in the letter that Halkiotis

---

[3] The language of each provision at issue is set forth below in the portion of the "Discussion" section addressing Halkiotis's breach of contract claim.
[4] Halkiotis admits that Saxon submitted a correction letter, but asserts, without citing any evidence, that this action was "incomplete and did not result in the removal of all derogatory credit reporting information."  (Pl.'s SOF ¶ 15.)

forward a copy of his current policy to Saxon.  Saxon sent Halkiotis another letter, dated October 4, 2007, stating, "[o]ur records indicate that the hazard insurance on your property is due to expire in approximately 14 days," and that "[y]our loan requires that we have evidence of continued hazard insurance in force at all times."  (Def.'s MSJ Ex. 1-I.)  Saxon again requested a copy of Halkiotis's policy in the October 4 letter.  (*Id.*)  Saxon sent Halkiotis a letter dated October 18, 2007, stating that, according to its records, his hazard insurance had expired, again requesting a copy of the policy, and notifying him that if he did not provide proof of insurance, Saxon would purchase coverage at his expense.  (Def.'s SOF ¶ 17; Def.'s MSJ Ex. 1-K.)  There is no evidence in the record that Halkiotis responded to these letters.  Halkiotis asserts that Saxon "should have received information from Chase [Saxon's predecessor] that the insurance had been previously renewed for the August 18, 2007 – August 18, 2008 period" (Pl.'s SOF ¶ 22), but he cites no supporting evidence and no provision of the Mortgage Agreement relieving him of his responsibilities in the event that Saxon's predecessor did not forward pertinent information.  Halkiotis submits an affidavit in which he avers that he "continuously had insurance in place on the Property" while Saxon was servicing the loan (Pl.'s Aff., ECF No. 120, at ¶ 11), and also cites a letter from State Farm Agent David De Lotto to Saxon, dated October 2, 2008, in which De Lotto informs Saxon that Halkiotis had "maintained continuous homeowner's insurance" at the property "effective August 17th, 2005," and that Halkiotis had paid "up until August 15, 2008" (Pl.'s SOF, Ex. 2).

There is no evidence in the record, however, that Saxon received notice of insurance coverage before December 13, 2007, at which point it initiated a $5,721.00 forced placed insurance policy covering the period of August 15, 2007, to August 15, 2008.  (Def.'s SOF ¶ 18.)  Saxon sent Halkiotis a letter dated December 18, 2007, informing Halkiotis of this purchase and

stating that $5,721.00 would be charged to his loan.  (*Id.* at ¶ 19.)  On January 2, 2008, Saxon

received from Halkiotis proof of an insurance policy covering the period of September 17, 2007,

to September 17, 2008.  (Anderson Aff. ¶ 15; Def.'s MSJ Ex. 1-L.)  As a result, Saxon cancelled

the policy it had purchased and credited Halkiotis's escrow account $5,204.96 – $516.04 less

than the amount Saxon had charged to Halkiotis's loan after initiating the forced placed policy.

(Def.'s SOF ¶ 21.)  Saxon refused to credit Halkiotis in full because, according to Saxon, it did

not receive evidence that the property was covered for the period between August 15, 2007 and

September 17, 2007.  (Id. at ¶ 22.)  Saxon notified Halkiotis of the partial credit by letter dated

January 7, 2008.  (Def.'s MSJ Ex. 1-M.)

      *B.   Interest Rate Adjustment and Loan Modification*

      On September 27, 2007, Saxon sent Halkiotis a letter informing him that Saxon was

adjusting his mortgage interest rate, effective November 1, 2007.  (Anderson Aff. ¶ 17; Def.'s

MSJ Ex. 1-N.)  Under the adjusted interest rate, Halkiotis's monthly principal and interest

payment increased from $2,599.77 to $3,200.82.  (Def.'s MSJ Ex. 1-N.)  The letter also stated

that "[t]his new payment does not include any escrows that may be included in your payment."

(*Id.*)  Halkiotis acknowledges receiving this letter, but contends that, shortly thereafter, a Saxon

employee named Brett Maloney "specifically instructed" him to "maintain the original monthly

mortgage payment in the amount of $2,599.77 and submit additional paperwork."  (Pl.'s Aff. ¶

14; *see also* Halkiotis Dep. II, June 18, 2014, Pl.'s Obj, Ex. 9, at 40:11–15 ("[I was] guaranteed

to continue at the original interest rate by a man named Brett, B-R-E-T-T, Maloney, M-A-L-O-

N-E-Y, he was the loss mitigation officer.").)  On November 15, 2007, Halkiotis submitted a

payment of $2,599.77.  (Def.'s SOF ¶ 24.)  Saxon considered this payment insufficient due to the

November 1 interest rate change, found Halkiotis to be in default, and held Halkiotis's payment

in suspense.  (*Id.* at ¶ 25.)  Halkiotis submitted payments of $2,599.77 through March of 2008 that Saxon considered "partial" and continued to hold in suspense pending further payments.  (Anderson Aff. ¶ 19.)  In April, Halkiotis submitted a payment of $2,547.99, which Saxon rejected and returned.  (Anderson Aff. ¶ 20; Def.'s MSJ Ex. O.)  In the letter returning Halkiotis's April payment, Saxon stated that it was rejecting the payment because "[t]his amount is not enough to bring the loan current," and "[o]nly certified funds will be accepted at this time to reinstate your loan because your loan has been breached or is in foreclosure."  (Def.'s MSJ Ex. O.)  In a letter dated April 9, 2008, Saxon informed Halkiotis that it was decreasing his interest rate as of May 1, 2008, thereby lowering his monthly principal and interest payment amount to $2,890.82.  (Def.'s MSJ Ex. 1-P.)  Again, Saxon stated that this amount did not include any escrow funds that might be due.  (*Id.*)  Halkiotis asserts that, given his conversation with Brett Maloney in late 2007, this second rate adjustment was also void.  On May 20, 2008, Halkiotis submitted a monthly payment in the amount of $2,547.99, which Saxon rejected and returned, explaining again that the amount was insufficient to bring the loan current, and that only certified funds would be accepted at that time because the loan had been breached or was in foreclosure.  (Anderson Aff. ¶ 22; Def.'s MSJ Ex. 1-Q.)

In a letter dated June 2, 2008, Saxon informed Halkiotis that he was approved for a loan modification, and "[i]f the terms are consistent with your prior discussions with Saxon," he should sign the modification agreement enclosed with the letter and submit a down payment of $4,295.43.  (Def.'s MSJ Ex. 1-R.)  On June 12, 2008, Halkiotis submitted to Saxon a signed copy of the modification agreement with the full down payment.  (Anderson Aff. ¶ 25; Def.'s MSJ Exs. 1-S, 1-T.)  The modification agreement includes five pertinent provisions.[5]  First, it

---

[5] As with the Mortgage Agreement provisions at issue, pertinent provisions of the Loan Modification are quoted below in the portion of the "Discussion" section addressing Halkiotis's breach of contract claim.

specified the total amount payable under the Note and Security Instrument at that time,

$391,788.17, which included "any interest and other amounts capitalized."  (Def.'s MSJ Ex. 1-S

("Loan Modification") § 1.)  Second, Halkiotis agreed to a "Balloon Amount" of $12,062.44

consisting of unpaid interest, advanced taxes, insurance premiums, and "other expenses

necessary to protect or enforce [Saxon's] interest," due on the maturity date or "payment-in-full

of all sums," whichever occurred first.  (*Id.* at § 5.)  Third, Halkiotis agreed that the Loan

Modification did not alter any portion of the Mortgage Agreement unless expressly so stated in

the Loan Modification (*id.* at § 7(b)), and that Halkiotis had "no right of set-off or counterclaim,

or any defense to the obligation of the Note or Security Instrument" (*id.* at § 7(d)).  Fourth, the

Loan Modification lowered Halkiotis's monthly principal and interest payment to $2,325.33

beginning June 1, 2008.  (*Id* at § 2.)  Fifth, the Loan Modification included an attachment, also

signed by Halkiotis, entitled, "ATTORNEY SELECTION NOTICE," which states, "By signing

below, it is understood and agreed that you may hire a lawyer or attorney to advise you regarding

this transaction and its consequences."  (Def.'s MSJ Ex. 1-S.)

　　　In submitting the signed Loan Modification and down payment, Halkiotis included a

cover letter, stating, "Please provide me with a specific itemized break-down of this

'contribution' payment (enclosed) and also a specific itemized break-down of the balloon

payment in the amount of $12,062.44 as so stated to be charged at the end of the mortgage

payment term."  (Def.'s MSJ Ex. 1-T.)  According to Halkiotis, Saxon never provided him such

a "break-down" for either the down payment or balloon amount before the time it filed its motion

for summary judgment.  (Pl.'s Aff. ¶ 18.)  Halkiotis also asserts that he signed the Loan

Modification only because he was "under the pressure of an arbitrary time restraint imposed by

Saxon," and that he "did not have the benefit of independent legal advice and [did] not

understand that I was being asked to forfeit and waive any claim or defense relating to" the balloon amount or down payment. (*Id.* at ¶¶ 16, 19.)

On July 16, 2008, and July 31, 2008, Saxon received payments from Halkiotis in the amount of $2,325.33. (Def.'s SOF ¶ 39–40.) Saxon applied the July 16 payment to the June 1, 2008 payment, but held the July 31 payment in suspense on the ground that it was insufficient because it did not include an amount for escrow funds. (*Id.* at ¶ 40.)

Saxon sent Halkiotis an updated Annual Escrow Account Disclosure Statement dated August 1, 2008, covering the period August 1, 2008 through July 1, 2009. (Anderson Aff. ¶ 30; Def.'s MSJ Ex. 1-U.) The Escrow Statement indicated that during that period, Halkiotis would be required to include $202.31 in addition to principal and interest in his monthly payments. (Def.'s MSJ Ex. 1-U.) Thus, beginning August 1, 2008, Halkiotis's required total monthly payment was $2,527.64 – which was noted in the escrow statement. (*Id.*) On August 25, 2008, Halkiotis submitted to Saxon a payment of $3,998.65. (Def.'s SOF ¶ 43.) Saxon considered this payment sufficient to bring the account current through August 1, 2008. (*Id.*) On September 16, 2008, Halkiotis submitted a payment of $2,325.33. (*Id.*) Because this payment did not include escrow funds, Saxon considered the September 16 payment insufficient and held it in suspense. (*Id.*)

On September 3, 2008, Saxon disbursed a renewal payment for homeowner's insurance coverage for the period between September 17, 2008, and September 17, 2009. (*Id.* at ¶ 44.) As a result, Saxon completed a new escrow analysis dated August 25, 2008, which indicated, according to Saxon, that Halkiotis's new monthly payment requirement would be $3,054.96. (*Id.* at ¶ 45; Def.'s MSJ Ex. 1-V.) On October 14, 2008, Halkiotis submitted a payment of $2,325.33. (Def.'s SOF ¶ 46.) Saxon considered this monthly payment insufficient because it

did not include the amount for escrow.  Saxon applied a portion of the October 14, 2008 payment and the previously suspended funds to the September 1, 2008 payment, and held the remaining funds in suspense.  (*Id.*)  Saxon completed another escrow analysis in May 2009 that decreased the anticipated cost of the September 2009 homeowner's insurance renewal from $4,853.00 (as stated in the August 2008 escrow statement, *see* Def.'s MSJ Ex. 1-V) to $1,071.00.  (Def.'s MSJ Ex. 1-W.)  As a result, beginning May 1, 2008, Halkiotis's monthly escrow amount was decreased from $642.33 to $327.17, making his total monthly required payment $2,652.50. (*Compare* Def.'s MSJ Ex. 1-V *with* Def.'s MSJ Ex. 1-W.)  Nonetheless, Halkiotis submitted to Saxon payments of $2,325.33 every month during the period between November 2008 and August 2009 – except for a $3,054.96 payment on June 15, 2009 – each of which Saxon held in suspense.  (Anderson Aff. ¶¶ 37–40.)

On September 16, 2009, Halkiotis submitted to Saxon a monthly payment in the amount of $2,652.50, which Saxon applied to the payment due June 1, 2009.  (*Id.* at ¶ 47.)  Halkiotis also made payments of $2,652.50 on October 16 and November 12, 2009, which were applied to the July 1 and August 1, 2009 payments.  (*Id.* at ¶ 48.)

### C. First American's Actions on the Property

On August 13, 2009, Halkiotis contacted Saxon by telephone to make a payment.  During that conversation, Halkiotis confirmed that the property was owner occupied.  (Def.'s SOF ¶ 50.)  Saxon claims that it attempted to contact Halkiotis by telephone fifteen times between August 14 and September 16, 2009, but received no response.  (*Id.*)  Halkiotis denies that Saxon made any reasonable effort to contact him during that period, in part because it failed to "leave any message concerning the purpose and/or urgency of its calls."  (Pl.'s Aff. ¶ 23; Pl.'s SOF ¶ 50.) On September 16, 2009, Saxon issued a work request to The First American Corporation ("First

American") – a company Saxon had hired to conduct property inspection and preservation – to inspect Halkiotis's property.  First American reported to Saxon that the property was "vacant." (Anderson Aff. ¶ 45.)  Halkiotis denies that the property was abandoned on that date, contending that "there was nothing about the Property that was amiss or gave the impression that it was abandoned: the lawn was well cared for, the house was painted, there were no broken windows, and the doors were all locked."  (Pl.'s Aff. ¶ 26.)

Based on the information received from First American, Saxon issued a work order for First American to "secure and winterize" the property, (Def.'s SOF ¶ 51), which a First American representative did on September 21, 2009 (*id.* at ¶ 52).  According to Halkiotis, the First American representative forcibly entered the house and caused damage to the property. (Pl.'s SOF ¶ 52.)  Specifically, Halkiotis claims that as a result of the First American representative's shutting off the building's power, the well pump was permanently damaged, costing $3,215.00 to replace.  (Pl.'s Aff. ¶ 34; Def.'s MSJ Ex. 10.)

Halkiotis claims that he was out of town on a business trip during these events, and that when he was notified by his landscaper on September 21 that an individual was on the property, he returned to the property and immediately called Saxon.  (*Id*. ¶ 23.)  Halkiotis could not gain access to his house because the locks had been changed and, as a result, he slept in his vehicle until Saxon sent Halkiotis new keys on September 24.  (Pl.'s SOF ¶ 53.)  Halkiotis claims he slept in his car for three nights before receiving working keys to his property.  (*Id.*)  Saxon claims that Halkiotis did not call Saxon until September 23, and that Saxon sent new keys to Halkiotis via overnight mail.  (Def.'s SOF ¶ 53.)

   *D.  Transfer to Ocwen and Commencement of Lawsuit*

On November 16, 2009, Saxon transferred its servicing rights to Ocwen.  (Anderson Aff. ¶ 50.)  Saxon sent Halkiotis a letter, dated October 30, 2009, informing him of the transfer of the servicing rights to his loan to Ocwen.  (Def.'s MSJ Ex. Z.)  On that date, Saxon's interactions with Halkiotis concluded.  On September 11, 2012, Halkiotis served Saxon with a state court complaint.  (Def.'s MSJ Ex. 6.)  Saxon removed the case to this Court on October 22, 2012. (ECF No. 1.)[6]

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).  "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response … must set forth specific facts demonstrating that there is a genuine issue for trial."  *Id.* (citation and internal quotation marks omitted).  In reviewing the record, the Court must "construe the facts in the light most favorable to the non-moving party," *Breyer v. County of Nassau*, 524 F.3d 160,163 (2d Cir. 2008), and "resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide," *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (citation omitted).  "[W]hile the

---

[6] Saxon filed its motion for summary judgment on July 21, 2014.  (ECF No. 95.)  Halkiotis and Saxon later notified the Court that they wished to participate in a settlement conference, and as a result, the Court denied Saxon's summary judgment motion without prejudice.  (ECF No. 123.)  In doing so, the Court informed the parties that if the settlement efforts were unsuccessful, Saxon could reassert its summary judgment motion.  On May 5, 2015, Saxon notified the Court that the settlement efforts were unsuccessful (ECF No. 130), and the Court vacated its previous order denying Saxon's summary judgment motion (ECF No. 131).

submissions of *pro se* litigants are to be liberally construed, the fact that a party is proceeding *pro se* does not otherwise relieve him from the usual requirements of summary judgment." *Morrison v. Dr. Pepper Snapple Group*, 916 F. Supp. 2d 372, 374 (W.D.N.Y. 2013) (citations and internal quotation marks omitted).

### III.    Discussion

#### A.  Breach of Contract

Halkiotis claims that Saxon breached the Mortgage Agreement by improperly holding in suspense or rejecting his payments throughout the period that Saxon serviced his loan.  He contends that Saxon's actions forced him to incur extra costs, damaged his credit rating, and caused him emotional distress.  (Am. Compl. ¶ 16.)

"The elements of a breach of contract claim are the [1] formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party, and [4] damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 298 (2014) (citations omitted).  Saxon denies that it breached the Mortgage Agreement and contends that it was entitled to hold in suspense or reject Halkiotis's payments under the Agreement because Halkiotis's payments were insufficient, either because (1) the amount was below the required principal and interest amount, or (2) the amount was equal to the principal and interest amount required but failed to include escrow funds.

As to Saxon's claims that certain payments were insufficient because they lacked escrow funds, Halkiotis contests his obligation to make such escrow payments.  Specifically, he argues he was not required to include escrow funds for insurance because he purchased insurance coverage independently.  In his opposition to Saxon's motion for summary judgment, Halkiotis argues, "there is substantial evidence that I paid the insurance premiums myself – dating back to

12

the original Note and Mortgage with Chase." (Pl.'s Mem. Opp., ECF No. 108, at 2.) Saxon responds that the Mortgage Agreement expressly required Halkiotis to pay escrow funds for insurance and stated that any waiver of the escrow payment requirement had to be in writing. No such written waiver exists in the record. Saxon also argues that the Loan Modification bars Halkiotis from asserting any breach of contract claim arising out of events occurring before the effective date of the modification.

As explained below, I agree with Saxon that by signing the Loan Modification, Halkiotis released his pre-modification breach of contract claims against Saxon. In addition, even if the Loan Modification did not amount to a release, Saxon would still be entitled to summary judgment as to his pre-modification breach of contract claims. Saxon was entitled under the Mortgage Agreement to initiate a forced placed insurance policy in January 2008. Further, Halkiotis's pre-modification payments were insufficient because he failed to comply with the interest rate changes implemented on November 1, 2007, and May 1, 2008, and his assertion that a Saxon representative agreed orally to preserve his original interest rate is barred by the statute of frauds.

With respect to Halkiotis's post-modification claim of breach of contract, the undisputed evidence in the record shows that Saxon acted within its rights under the Mortgage Agreement to suspend or reject all but one of Halkiotis's post-modification payments. As to the July 31, 2008 payment that Saxon held in suspense, Saxon has failed to bear its burden on summary judgment because there is no evidence in the record that Saxon ever informed Halkiotis of the amount of escrow funds he was required to include in that payment. As explained below, while Halkiotis was plainly required to include *some* amount in escrow funds with that payment, a reasonable juror could find that Saxon had to inform him of the amount of escrow funds due, and that Saxon

failed to do so until August 2008. The July 31, 2008 payment included an adequate amount in

principal and interest. A reasonable juror could therefore find that Saxon breached the Mortgage

Agreement by holding the July 31, 2008 payment in suspense due to lack of escrow funds.

    **i.**    **Pre-Modification Claims**

        *a. Effect of Loan Modification*

Saxon argues that the Loan Modification bars Halkiotis from bringing a breach of

contract claim arising out of events occurring prior to the Loan Modification's effective date.

Section One of the Loan Modification states, "As of May 1st, 2008, the amount payable under

the Note and Security Instrument is [$]391,788.17, consisting of the unpaid amount(s) loaned to

Borrower by Lender plus any interest and other amounts capitalized. Borrower promises to pay

[that amount], plus interest, to any order of Lender." (Loan Modification § 1.) Section Five

states,

> The Borrower acknowledges that interest has accrued but has not been paid and
> Lender has incurred, paid or otherwise advanced taxes, insurance premiums and
> other expenses necessary to protect or enforce its interest under the Note and the
> Security Instrument, and that such interest, taxes, insurance premiums and other
> expenses in the total amount of **$12,062.44** (collectively, the "Balloon Amount")
> will be due and payable on the Maturity Date . . . .

(*Id.* at § 5.) Section Seven states, "Borrower understands and agrees that: . . . [he] has no right of

set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument."

(*Id.* at § 7(d).) I find that Sections Five and Seven, read in conjunction, unambiguously release

Halkiotis's claim that Saxon breached the Mortgage Agreement by rejecting or holding in

suspense pre-modification payments that did not include sufficient escrow payments or interest

amounts.

"[T]he interpretation of a contract may either be a question of law or fact, depending on

whether the language of the contract is clear and unambiguous." *Histen v. Histen*, 98 Conn.

App. 729, 732–33 (2006) (citation and internal quotation marks omitted).  "Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Yellow Book Sales & Distr. Co., Inc. v. Valle*, 311 Conn. 112, 119 (2014) (citation and internal quotation marks omitted).  The terms of the Loan Modification are unambiguous.  By signing the Loan Modification, Halkiotis acknowledged that "interest has accrued, but has not been paid," and that he also owed amounts "Lender has incurred, paid or otherwise advanced" for "taxes, insurance premiums and other expenses," totaling $12,062.44.  (Loan Modification § 5.)  Halkiotis further acknowledged that, against this unpaid amount, he had "no right of set-off or *counterclaim*."  (*Id.* at § 7(d) (emphasis added).)  His claims that Saxon had breached the Agreement by charging him for insurance premiums and excessive interest would, at the time he acknowledged in the Loan Modification that he owed past due amounts for insurance premiums and interest (among others), have been "counterclaims" under Section 7(d) of the Loan Modification.  By acknowledging he had no such counterclaims, he released these claims.  *See Price v. U.S. Bank Nat'l Ass'n*, 13-cv-175(O) 2014 WL 803722, at *5 (N.D. Tex. Feb. 28, 2014) (finding a provision stating that the plaintiff "had no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument" to release the plaintiff's pre-modification claims); *Brown v. Bank of New York Mellon*, No. 10-cv-550(RHB), 2011 WL 206124, at *2 (W.D. Mich. Jan. 21, 2011) (dismissing breach of contract claim because "[w]hen Plaintiff and Saxon entered into the 2008 loan modification agreement, Plaintiff acknowledged the amount past due, . . . [and] that she had no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument").  Further, Halkiotis unambiguously agreed in Section Five of the Loan Modification to the balloon amount that Saxon asserted was due in "interest, taxes [and] insurance premiums"

– thereby effectively acknowledging that whatever previous claims he might have had disputing these charges were settled, fully and finally, by the agreement to make the balloon payment. These provisions release Halkiotis's claims of breach of contract arising out of events occurring before the date on which the Loan Modification took effect.

Halkiotis contends that he did not understand the terms of the Loan Modification: "The Plaintiff, who did not have the benefit of independent legal advice, did not understand that he was being asked to forfeit and waive any claim or defense . . ." (Pl.'s SOF ¶ 33.)  This is not a defense to the obligations of a contract.  Absent evidence of "fraud, artifice, or mistake not due to negligence," "where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is that person's duty to read it and notice of its contents will be imputed to that person if that person negligently failed to do so." *Office Furniture Rental Alliance, LLC v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 111, 121 (D. Conn. 2013) (citation and internal quotation marks omitted).  Halkiotis's contention that he should not be held to the terms of the Loan Modification because he lacked independent legal advice is similarly unconvincing.  *See Chorches v. Stewart Title Guar. Co.*, No. 13-cv-01182(JAM), 2014 WL 4494240, at *4 (D. Conn. Sept. 10, 2014) ("Nor does the fact that the [unrepresented party] chose not to avail himself of the advice of counsel before deciding to sign the release create a genuine fact issue that the Release was ambiguous, much less that he did not or could not understand its clear and broad terms.").  Further, Halkiotis signed the "Attorney Selection Notice," in which he expressly acknowledged receiving the opportunity to obtain the advice of counsel before agreeing to the terms of the Loan Modification.  (Def.'s MSJ Ex. 1-S.)

While the plain language of the Loan Modification is sufficient to grant summary judgment as to Halkiotis's pre-modification breach of contract claims, I nonetheless address the

16

merits of his claims "in an abundance of caution."  *Cf. Price*, 2014 WL 803722, at *5

("Plaintiff's claims could reasonably be said to arise out of the 'loan agreement' and Defendant's

subsequent foreclosure, so they are barred by the 'release' provision of the loan modification

agreement.  Give Plaintiff's *pro se* status, however, her claims are also addressed on the merits in

an abundance of caution.").

### b.   Forced Placed Purchase of Hazard Insurance

Halkiotis's allegations about purchasing his own insurance raise the question whether

Saxon breached the Mortgage Agreement in January 2008 by its forced placed purchase of

hazard insurance.[7]  Because Halkiotis presents no evidence that he provided Saxon with timely

confirmation of his insurance renewal for the 2007 to 2008 period, however, no reasonable juror

could find that Saxon breached the Mortgage Agreement by purchasing a forced placed

insurance policy.

Saxon notified Halkiotis in a letter dated October 4, 2007, that his hazard insurance was

set to expire in "approximately 14 days."  (Def.'s MSJ, Ex. 1-I.)  In a letter dated October 18,

2007, Saxon informed Halkiotis that his insurance coverage had expired.  (Def.'s MSJ, Ex. 1-J.)

The record includes no evidence that Halkiotis responded to these letters.  As a result, Saxon

initiated the forced placed insurance policy covering August 2007 to August 2008 and charged

the amount paid to Halkiotis's loan.  (Def.'s MSJ, Ex. 1-K.)  When Halkiotis eventually provided

Saxon with confirmation in January 2008 that he had purchased coverage for the period

September 2007 through September 2008, Saxon cancelled its coverage and credited Halkiotis's

escrow account.  But Saxon did not reimburse Halkiotis's escrow account for the full amount it

charged him – it withheld $516.04 because "Saxon did not receive any evidence of insurance for

---

[7] Halkiotis does not expressly raise the January 2008 forced placed insurance policy purchase as a basis for his breach of contract claim.  Given my obligation to construe his submissions liberally, however, I consider whether Saxon breached the Mortgage Agreement in this manner.

the period of August 15, 2007 to September 17, 2007 and as a result Halkiotis was responsible

for the $516.04 difference."  (Anderson Aff. ¶ 16.)

> Section Five of the Mortgage Agreement states the following:
>
> Borrower shall keep the improvements now existing or hereafter erected on the
> Property insured against loss by fire, hazards included within the term "extended
> coverage," and any other hazards including, but not limited to, earthquakes and
> floods, for which Lender requires insurance. . . . If Borrower fails to maintain any
> of the coverages described above, Lender may obtain insurance coverage, at
> Lender's option and Borrower's expense.  Lender is under no obligation to
> purchase any particular type or amount of coverage. . . . Borrower acknowledges
> that the cost of the insurance coverage so obtained might significantly exceed the
> cost of insurance the Borrower could have obtained.  Any amounts disbursed by
> Lender under this Section [] shall become additional debt of Borrower secured by
> this Security Instrument. . . . If Lender requires, Borrower shall promptly give to
> Lender all receipts of paid premiums and renewal notices.

(Mortgage Agreement § 5.)  There is no evidence in the record that as of October 18, 2007,

Saxon received any indication from Halkiotis that he had renewed his insurance policy for the

following year.  The De Lotto Letter – the only evidence Halkiotis cites to show that there was

no gap in coverage – cannot be a basis for finding that Saxon improperly initiated a forced place

purchase because it is dated October 2, 2008, almost a year after the date on which Halkiotis was

required to provide proof of insurance.  It is clear that Saxon was within its power under Section

Five of the Mortgage Agreement to initiate a forced placed insurance purchase (and charge the

cost to Halkiotis's loan) when Halkiotis failed to provide timely proof of renewed coverage.

The only question, then, is whether Saxon was required to reimburse Halkiotis in full for

the amount charged to his loan when Halkiotis provided proof of his renewal.  I find no

reasonable juror could find that Saxon was obligated to do so under the Mortgage Agreement.

The Mortgage Agreement expressly states that if Halkiotis failed to maintain coverage, Saxon

could purchase coverage at "Borrower's expense."  (Mortgage Agreement § 5.)  There is no

provision stating that if the borrower provides untimely confirmation of coverage after the lender

18

has purchased a new insurance policy, the lender must fully reimburse the borrower.[8]  Further,

Saxon properly purchased a policy effective August 17, 2007.  The evidence in the record

suggests that Halkiotis's annual insurance policies began and ended in August.  The De Lotto

Letter states that Halkiotis first purchased his annual policy on August 17, 2005, and that his

then-current policy was concluding on August 15, 2008.[9]

In short, no reasonable juror could find that Saxon breached the Mortgage Agreement by

initiating a forced placed insurance policy effective August 17, 2007, and failing to reimburse

Halkiotis upon receiving his tardy policy renewal confirmation.

### c.  *Rejecting and Holding Payments in Suspense*

The evidence in the record makes clear that the pre-modification payments that Saxon

rejected or held in suspense failed to include an adequate amount of principal and interest.

Saxon was entitled to hold in suspense or reject any payment that was insufficient under Section

One of the Mortgage Agreement:

> Lender may return any payment or partial payment if the payment or partial
> payments are insufficient to bring the Loan to current.  Lender may accept any
> payment or partial payment insufficient to bring the Loan current, without waiver
> of any rights hereunder . . . but Lender is not obligated to apply such payments at
> the time such payments are accepted. . . . Lender may hold such funds until
> Borrower makes payment to bring the Loan current. . . . No offset or claim which
> Borrower might have now or in the future against Lender shall relieve Borrower
> from making payments due under the Note and this Security Instrument or
> performing the covenants and agreement secured by this Security Instrument.

(Mortgage Agreement § 1.)  During the period between November 1, 2007, and the effective date

of the Loan Modification, Halkiotis submitted payments that not only failed to include escrow

---

[8] Saxon might have been obligated to cancel the forced purchased policy under its obligation to mitigate damages as a result of *Halkiotis's* breach of the Mortgage Agreement because the policy Saxon purchased was considerably more expensive than Halkiotis's policy.  But that obligation would arise only if Saxon made a claim against Halkiotis, which it has not.
[9] While Saxon's letters in the fall of 2007 indicate that the policy would have expired in October, this may have reflected a grace period.

payments, but also failed to include an adequate amount for principal and interest.  In a letter

dated September 27, 2007, Saxon notified Halkiotis that his mortgage rate was adjusted as of

November 1, 2007, and as a result, his monthly payment amount in principal and interest

increased to $3,200.82.  (Def.'s MSJ Ex. 1-N.)  There is no dispute that Halkiotis failed to

increase his monthly payments in accordance with the rate change as described in the letter.

Given the language of Section One above, Saxon was entitled to reject or hold in suspense those

payments.

      Halkiotis contends that the rate change was void because of an oral agreement he made

with Saxon employee Brett Maloney.  Halkiotis claims that Maloney instructed him, over the

telephone, to continue submitting monthly payments in the amount required prior to the

November 2007 interest rate change.  In his deposition, Halkiotis stated that Maloney

"guaranteed [that Halkiotis could] continue at the original interest rate."  (Halkiotis Dep. II, at

40:11–15.)  Halkiotis's contention is foreclosed by the statute of frauds.

      The statute of frauds requires that, in order to be enforceable, Halkiotis's purported oral

agreement with Maloney be in writing.  It states, in part, "[n]o civil action may be maintained in

the following cases unless the agreement, or a memorandum of the agreement, is made in writing

and signed by the party, or the agent of the party, to be charged: . . . (4) upon any agreement for

the sale of real property or any interest in or concerning real property . . . or (6) upon any

agreement for a loan in an amount which exceeds fifty thousand dollars."  Conn. Gen. Stat. § 52-

550(a).  This applies to purported oral modifications to existing mortgage agreements.  In *Snow*

*v. Dickson*, No. TTD-CV-09-6000773-S, 2010 WL 4943390 (Conn. Super. Ct. Nov. 18, 2010),

for example, the court rejected the mortgagors' claim that there was an oral agreement between

them and the mortgagee excusing a number of late payments.  "[E]ven if there was evidence

presented to establish that an oral modification took place such modification would be insufficient to defeat the plaintiffs' action.  A mortgage deed and promissory note are agreements concerning real property and are therefore subject to the statute of frauds."  *Id.* at *3; *see also Deutsche Bank Trust Co. Americas v. DeGennaro*, 149 Conn. App. 784, 788 (2014) ("The alleged oral modification [between the mortgagor and mortgagee] could not have complied with the statute of frauds pursuant to General Statutes § 52-550.").  Because Halkiotis's Mortgage Agreement falls within the statute of frauds – under both Conn. Gen. Stat. §§ 52-550(a)(4) and 52-550(a)(6) – any agreement modifying the terms of his loan could not have effect unless it was memorialized in writing.  The record contains no such written document.

According to the undisputed facts, Halkiotis submitted monthly payments of $2,599.77 through May 2008 despite the fact that his interest rate increase required monthly payments of $3,200.82 in principal and interest.[10]  As a result, there is no genuine issue of material fact as to Halkiotis's claim that Saxon misapplied his monthly payments between November 1, 2007, and the effective date of the Loan Modification.  Under the terms of the mortgage and the adjusted rates, Halkiotis's payments provided insufficient principal and interest, and Saxon was entitled to reject or hold his payments in suspense under Section One of the Mortgage Agreement.  Saxon is therefore entitled to summary judgment on this issue as well.

### ii.    Post-Modification Claims

Halkiotis returned to Saxon the signed Loan Modification and down payment with a letter dated June 12, 2008.  (Def.'s MSJ Exs. S, T.)  Halkiotis asserts that Saxon breached the Mortgage Agreement, as altered by the Loan Modification, by continuously misapplying his post-modification monthly payments.  It is undisputed that, under the Loan Modification,

---

[10] Saxon altered Halkiotis's rate for a second time, effective May 1, 2008, lowering his monthly principal and interest payment requirement to $2,890.82.  (Def.'s MSJ Ex. 1-P.)  In May, Halkiotis submitted a payment of $2,547.99 (Anderson Aff. ¶ 22), which was also insufficient, even under this decreased amount due.

Halkiotis was required to pay a monthly amount of $2,325.33 in principal and interest.  Halkiotis submitted that exact amount on July 16 and July 31, 2008.  Saxon held the second payment in suspense because it did not include escrow funds.  Halkiotis argues that $2,325.33 was sufficient because he was not required (or, alternatively, was never told he was required) to pay escrow funds in addition to the principal and interest amount.  Saxon responds by arguing that Halkiotis was required to continue including escrow funds in his payments because the Loan Modification did not alter that provision of the Mortgage Agreement.  (*See* Loan Modification § 7(b) ("All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified . . .").)

Section Three of the Mortgage Agreement required Halkiotis to make escrow payments for property taxes and insurance premiums in addition to his principal and interest amounts:

> Borrower shall pay to Lender . . . a sum [] to provide for payment of amounts due for: (1) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property . . . (c) premiums for any and all insurance required by Lender under Section 5. . . . Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.

(Mortgage Agreement § 3.)  Halkiotis contends, again, that Saxon improperly required him to pay escrow funds for insurance premiums.  Because he was purchasing insurance on his own, he argues, he was not required to pay any escrow funds for insurance.  Halkiotis cites an insurance addendum that was originally included with the Mortgage Agreement.  (*See* Pl.'s SOF, Ex. 1 ("Insurance Addendum").)  He asserts that the addendum and Section Three of the Mortgage Agreement "conflict" with regard to his responsibility for insurance escrow funds.  (Pl.'s Aff. ¶ 3.)  But the Insurance Addendum makes no mention of his escrow payment obligation.  It simply states that Halkiotis was required to purchase a one year policy at the time of the closing; it does not specify how he was to pay for it – directly or through escrow payments to the lender.

Moreover, as Saxon argues, Halkiotis's obligation to submit insurance escrow funds could only be waived in writing.  The Insurance Addendum cannot be viewed as a waiver of Halkiotis's obligation to pay escrow funds because it makes no mention of the escrow obligation.  Halkiotis has not offered any other evidence that Saxon – or Chase, before transferring the servicing rights to Saxon – waived this requirement in writing.

As for the two July 2008 payments Halkiotis submitted, however, Saxon provides no evidence that it informed Halkiotis of the amount of escrow funds he was required to pay.  The loan had just been modified, and the monthly principal and interest payment had changed – again.  While the Loan Modification restated the original obligation in the Mortgage Agreement to pay escrow, it did not specify an amount.  Saxon did provide an "Annual Escrow Account Disclosure" statement to Halkiotis covering the period of August 1, 2008 through July 1, 2009, informing Halkiotis that he must include $202.31 in each monthly payment in addition to principal and interest.  (Def.'s MSJ Ex. 1-U.)  But Saxon offers no comparable evidence of an Annual Escrow Account Disclosure covering June or July 2008 that would establish the amount Halkiotis was required to pay in those months, in addition to his monthly principal and interest.  Further, Saxon accepted Halkiotis's July 16 payment, which did not include escrow payments.  (*See* Anderson Aff. ¶¶ 27–28.)  While Saxon had no obligation to inform Halkiotis that he was required to pay some amount in escrow funds (as it expressly stated so in the Mortgage Agreement), Saxon has failed to satisfy its burden of demonstrating that it informed Halkiotis of the amount of escrow funds he was required to pay – or that he was otherwise expected to know that amount.  Even in its brief, Saxon fails to specify the amount in escrow Halkiotis was obligated to pay in his June and July 2008 payments.  Because Saxon fails to meet its burden to show that there is no dispute as to a material fact and that it is entitled to judgment as a matter of

law, summary judgment is denied as to the question of whether Saxon breached the Mortgage Agreement by holding Halkiotis's July 31, 2008 payment in suspense.  *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) ("If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden, summary judgment must be denied even if no opposing evidentiary matter is presented." (citation and internal quotation marks omitted)).

As for the payments made after August 1, 2008, Saxon was entitled under the Mortgage Agreement to hold in suspense or reject Halkiotis's payments.  Saxon sent Halkiotis an Annual Escrow Disclosure Statement dated August 1, 2008, indicating that his monthly payments should include $202.31 in escrow and "shortage payment"[11] funds.  (Def.'s MSJ Ex. 1-U.)  Halkiotis submitted a payment of $3,998.65 on August 25, 2008, which brought his account current through August 1, 2008.  After initiating another forced place insurance policy on September 3, 2008, Saxon issued a new Annual Escrow Disclosure Statement, which instructed Halkiotis to pay $729.63 in monthly escrow and shortage payments, making his total monthly payment requirement $3,054.96.  (Def.'s MSJ Ex. 1-V.)[12]  But Halkiotis's September payment included a total amount of only $2,325.33 (the amount due in principal and interest only).  Halkiotis continued to make monthly payments of $2,325.33 between November 2008 and August 2009 – with the exception of a $3,054.96 payment on June 15, 2009 – each of which was insufficient to pay the escrow amount in addition to principal and interest.  Thus, the undisputed evidence in the

---

[11] Neither party explains why the "shortage payments" were included in the Annual Escrow Disclosure. Nonetheless, Halkiotis does not contest these charges.

[12] Halkiotis asserts that the August 25, 2008 Escrow Disclosure Statement overestimated the cost of a policy renewal in September 2009.  He cites the May 7, 2009 Escrow Disclosure Statement, which indicates that the policy renewal in September 2009 cost of $1,071.00 (Def.'s MSJ Ex. W), as opposed to the anticipated cost of the same renewal in the August 25, 2008 Escrow Disclosure Statement that was listed as $4,853.00 (Def.'s MSJ Ex. V).  To the extent this is another claim of breach of contract, it fails.  The May 7, 2009 Escrow Disclosure Statement estimated the monthly escrow payment based on the current escrow balance.  Even if Saxon overestimated the cost of a September 2009 policy renewal in August 2008, any overpayment Halkiotis would have submitted as a result of the purportedly erroneous estimation would have been offset and resulted in a lower monthly escrow payment as reflect by the May 7, 2009 calculation.  In any event, he failed to submit *any* amount of escrow funds from September 2008 to August 2009 (with the exception of the June 2009 payment), making any error by Saxon on this point moot.

record shows that from September 1, 2008, until Saxon transferred its servicing rights to Ocwen in November 2009, Saxon did not breach the Mortgage Agreement by suspending or rejecting Halkiotis's payments because they were insufficient.  Summary judgment is granted as to this aspect of Halkiotis's breach of contract claim.

For the reasons discussed above, summary judgment is granted on Halkiotis's breach of contract claim except as to one limited claim: that Saxon improperly held in suspense Halkiotis's July 31, 2008 payment.[13]

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

In Count Two, Halkiotis claims that Saxon breached the parties' implied covenant of good faith and fair dealing by engaging in the "practice of suspending, returning, apportioning and misapplying legitimate and complete payments – as prescribed – together with an entire plethora of fees, charges and penalties with compounded interest thereupon, prevented that enjoyment and the sustainment of good credit."  (Pl.'s Obj., ECF No. 108, at 2.)  Because Halkiotis offers no evidence that Saxon engaged in conduct with a dishonest purpose or sinister motive, I grant summary judgment on this count.

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.  Bad faith means more than mere negligence; it involves a dishonest purpose." *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 598 (1996) (citation and internal quotation marks omitted).  "Bad faith in general implies both actual or constructive fraud, or a design to

---

[13] Halkiotis asserts in his Local Rule 56(a) Statement that Saxon insufficiently remedied the consequences of its mistake when it incorrectly reported Halkiotis's account as being in default upon first obtaining servicing rights. (*See, e.g.*, Pl.'s SOF ¶ 15 ("Although Saxon claims to have promptly submitted a correction to the national credit reporting bureaus, such action was incomplete and did not result in the removal of all derogatory credit reporting information.").)  He submits no evidence to support this assertion.  In addition, although it is unclear whether he raises this issue as a claim of breach of contract, any such claim would preempted by federal law.  *See* 15 U.S.C. § 1681t(b)(1)(F); *Barletta v. Bank of America*, No. 10-cv-01311(WWE), 2011 WL 6937544 (D. Conn. Oct. 20, 2011) (ruling plaintiff's breach of contract claim, among others, was preempted by Section 1681t(b)(1)(F)).

mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004) (citation and internal quotations marks omitted).

Halkiotis argues that "it is bad faith for any lender to assess erroneous late fees, charges and penalties while at the same time disseminating negative credit reports when it cannot accurately account for the payments which have already been made." (*Id.* at 3.) Saxon responds that it is entitled to summary judgment on this count because Halkiotis "has not produced any evidence that Saxon acted with a dishonest purpose or sinister motive." (Def.'s MSJ at 18.)

I agree with Saxon that there is no evidence that Saxon acted in bad faith in its dealings with Halkiotis. As shown, for the majority of the parties' dealings, Halkiotis consistently submitted insufficient monthly payments, and Saxon was entitled to reject or hold in suspense those payments, as well as assess late fees and penalties. Further, as to the single aspect of Halkiotis's breach of contract claim that has survived summary judgment, Halkiotis provides no evidence of bad faith. There is no evidence in the record suggesting that Saxon acted with sinister intent in failing to inform Halkiotis of the amount of escrow funds he needed to include in his July 31, 2008 payment. In his papers, Halkiotis does nothing more than make a bare assertion that Saxon acted in bad faith in its dealings with him. Such assertions are insufficient to survive summary judgment. *See Pride Acquisitions, LLC v. Osagie*, No. 12-cv-639(JCH), 2014 WL 4843688, at *13 (D. Conn. Sept. 29, 2014) ("Although intent is generally an issue for the jury to decide, a plaintiff is not entitled to have a claim go to the jury [on a claim of violation of the implied covenant of good faith and fair dealing] where his only support for the intent element is a bare assertion of bad faith."). Summary judgment is granted on Count Two.

## C.  CUTPA

In Count Three, Halkiotis claims Saxon violated CUTPA by engaging in conduct that was "immoral, unethical, oppressive or unscrupulous[, which] constitutes an unfair method of competition or an unfair deceptive act or practice in the conduct of trade or commerce."  (Am. Compl. at 5.)  Because Halkiotis cites no evidence suggesting that Saxon engaged in unfair conduct, but rather reasserts his arguments that Saxon breached the Mortgage Agreement, summary judgment is granted on Count Three.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "It is the intention of the legislature that [CUTPA] be remedial and be so construed."  Conn. Gen. Stat. §42-110b(d); *accord Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995) ("The entire act is remedial in character, and must be liberally construed in favor of those whom the legislature intended to benefit." (citations and internal quotation marks omitted)).

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining whether a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory or other established concepts of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Ramirez v. Health Net of Northeast, Inc.*, 285 Conn. 1, 18–19 (2008).  "[A] breach of contract standing alone does not offend public policy" absent "aggravating circumstances surrounding the breach."  *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1039 (2d Cir. 1995).

In support of his CUTPA claim, Halkiotis argues that "[t]hroughout the course of Saxon['s] servicing of the loan, I have paid a substantial amount of charges, penalties and late fees with the additional levying of compounded interest which I should not be forced to pay. Due to this . . . a reasonable jury could find said actions of this nature are unscrupulous and an oppressive practice which causes substantial injury to consumers in the form of lost capital, higher fees, more interest paid, and harm to consumers' credit."  (Pl.'s Obj. at 4.)  Saxon responds that Halkiotis's CUTPA claim is wholly derivative of his breach of contract claim, and that given the absence of any evidence indicating aggravating circumstances, this claim must fail.  (Def.'s MSJ at 20–22.)

I grant summary judgment on this count for substantially the same reasons discussed in the section above rejecting Halkiotis's claim of violation of the implied covenant of good faith and fair dealing.  Most of the conduct to which Halkiotis refers does not amount to even breach of contract.  *See Omni Corp. v. Sonitrol Corp.*, 303 F. App'x 908, 911 (2d Cir. 2008) (ruling where a claim under CUTPA "duplicates" a breach of contract claim, "rejection of the latter disposes of the former").  Halkiotis mostly reincorporates in this count the arguments and evidence he presents as evidence of breach of contract.  While Halkiotis cites the "substantial amount of charges, penalties, and late fees" he incurred as a result of Saxon's suspending or rejecting his payments, most of those charges, penalties, and late fees were a result of his own failure to submit sufficient monthly payments.  As to the limited breach of contract claim that survives summary judgment, there is no evidence to suggest that Saxon's holding a payment in suspense after it failed to indicate to Halkiotis how much in escrow he was obligated to pay was unfair or deceptive.  *Cf. De La Concha*, 269 Conn. at 442 ("The very same evidence upon which those findings [in denying an implied covenant of good faith and fair dealing claim] were

predicated also provides the basis for the court's determination that the defendant did not engage in any conduct prohibited by CUTPA.").   No reasonable juror could conclude from the evidence presented that Saxon had engaged in immoral, unethical, or unscrupulous conduct.   Summary judgment is granted on Count Three.

   D.  *CCCPA and FDCPA*

   In Counts Four and Five, Halkiotis claims that Saxon violated the CCCPA and FDCPA, respectively.   He argues that Saxon used "abusive, harassing and misleading debt collection practices by falsely accusing Plaintiff of failing to pay mortgage payments."   (Am. Compl. at 5.) These claims are time-barred, and summary judgment is therefore granted on the CCCPA and FDCPA counts.

   The dates relevant to this issue are undisputed.   Ocwen assumed the servicing rights for Halkiotis's mortgage from Saxon on November 16, 2009, and there is no evidence in the record that Saxon had contact with Halkiotis or handled his loan after that date.   (Def.'s SOF ¶ 56.) Halkiotis served his complaint on Saxon on September 11, 2012 (Def.'s MSJ Ex. 6), and filed this action in Connecticut Superior Court on September 21, 2012 (ECF No. 1, at ¶ 1).   Saxon later removed the action to this Court.   (ECF No. 1.)

   The statute of limitations for a claim under the CCCPA is one year: "[a]n action to enforce liability under [the CCCPA] may be brought in any court of competent jurisdiction not later than one year after the date on which the violation occurs."   Conn. Gen. Stat. § 36a-648(d). Under Connecticut law, an action is considered to have commenced when the plaintiff serves the defendant with the complaint.   *See Rana v. Ritacco*, 236 Conn. 330, 337 (1996) ("This court has long held that an action is brought once the writ, summons and complaint have been served upon a defendant.").   Thus, even if Saxon violated the CCCPA until the final day in which it was

involved in Halkiotis's loan, Halkiotis must have served Saxon with a complaint by November 16, 2010 to meet the statute of limitations.  Because Halkiotis failed to do so, his CCCPA claim is time-barred.

The same analysis applies to Halkiotis's FDCPA claim.  The FDCPA also contains a one-year statute of limitations: "[a]n action to enforce any liability created by [the FDCPA] may be brought . . . within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).  Because Halkiotis filed this case in state court, Connecticut law governs when Halkiotis "brought" his FDCPA claim.  *See, e.g.*, *Winkels v. George A. Hormel & Co.*, 874 F.2d 567, 570 (8th Cir. 1989) (applying state law to determine the timeliness of a federal labor claim removed from state court because, in part, "[a] federal court must honor state court rules governing commencement of civil actions when an action is first brought in state court and then removed to federal court, even though the cause of action arises from federal law" (citation omitted)); *Prazak v. Local 1 Intern. Union of Bricklayers & Allied Crafts*, 233 F.3d 1149, 1152–54 (9th Cir. 2000) (same); *but see Cannon v. Kroger Co.*, 832 F.2d 303, 305–06 (4th Cir. 1987) (applying federal law to determine the timeliness of the same federal labor claim removed from state court, contrary to *Winkels* and *Prazak*).[14]  In order to have made a timely claim, then, Halkiotis must have served Saxon with his complaint no later than November 16, 2010.

As noted, there is no evidence in the record that Saxon remained involved in Halkiotis's mortgage or took any acts falling within the FDCPA or CCCPA after it transferred the servicing rights to Ocwen in November 2009.  Thus, more than a year elapsed before Halkiotis

---

[14] As demonstrated by the conflicting case law above, this question is unsettled.  District courts in this circuit have mostly agreed with *Winkels* and *Prazak*, however, and have applied state law to determine the timeliness of federal claims first filed in state court.  *See Gorwin v. Local 282, I.B.T.*, 838 F. Supp. 116, 120–23 (S.D.N.Y. 1993); *Raffe v. Amer. Nat. Red Cross*, No. 08-cv-00211(NPM), 2011 WL 6019436, at *8 (N.D.N.Y. Nov. 30, 2011) *amended on other grounds* 2012 WL 140412 (N.D.N.Y. Jan. 18, 2012).  But even if federal law governed when Halkiotis's FDCPA claim was commenced against Saxon, his claim would be time-barred because he filed the complaint with the state court *after* serving Saxon.  *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.").

30

commenced this suit, and his FDCPA and CCCPA claims are time-barred.  I grant summary judgment to Saxon on Counts Four and Five.

### E.  Trespass

In Count Six, Halkiotis seeks damages resulting from an alleged trespass committed by the representative of First American.  Saxon argues that it cannot be held liable for the actions of the First American employee because First American was operating as an independent contractor for Saxon at the time any damage was done to the property.  The doctrine of *respondeat superior* does not apply, Saxon argues, if First American was acting as an independent contractor rather than an employee.  Alternatively, Saxon argues that no trespass occurred.  Because Saxon has failed to meet its burden of demonstrating that it had a reasonable basis to believe Halkiotis's property was abandoned, however, I deny summary judgment on Count Six.

Saxon frames Halkiotis's trespass claim in the context of negligence, contending it cannot be held liable for the actions of an independent contractor.  "Under the doctrine of *respondeat superior*, a master is liable for the willful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business."  *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500 (1995).  But if the subordinate is an independent contractor, rather than an employee, *respondeat superior* liability does not apply, and the party who hired the independent contractor normally cannot be held liable for the contractor's actions. *Machado v. City of Hartford*, 292 Conn. 364, 371 (2009) ("It is well established that, under the general rule, an employer is not liable for the negligence of its independent contractors.").  Saxon argues that Halkiotis has provided no evidence that Saxon and First American's relationship was such that Saxon controlled the means and methods of First American's work.  It also cites its contract with First American, which states,

> First American acknowledges that it is acting as an independent contractor, that First American is solely responsible for its actions or inactions, and that nothing in this Agreement nor the Exhibits from time to time entered into by the parties, will be construed to create an agency or employment relationship between [Saxon] and First American or its Representatives.

(Def.'s MSJ Ex. 1-X, at ¶ 21(a).)[15]   As a result, Saxon contends, no reasonable juror could find that First American was acting as an employee of Saxon, and given the non-liability rule for independent contractors, Saxon cannot be held liable for First American's actions on Halkiotis's property.  But Saxon fails to address a threshold question: whether it had sufficient reason to believe that the property was "abandoned" when it ordered First American to secure and winterize the property.  If not, Saxon can be held liable for First American's actions on the property.

Saxon has failed to provide the Court with evidence proving that it had adequate reason to believe that the house was abandoned and thus adequate cause to issue the work order to First American.  Section Nine of the Mortgage Agreement states the following:

> If [] Borrower fails to perform the covenants and agreement contained in this Security Instrument, . . . or [] Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.

---

[15] Halkiotis admits that such a document exists, but denies "that such document describes the type of services to be provided by First American Corporation."  (Pl.'s SOF ¶ 48.)  Halkiotis also contends that "the actual actions and representations made by both First American Corporation and Saxon made it clear that agents and/or employees of First American Corporation were directly controlled and guided by instructions issued by Saxon."  (*Id.* at ¶ 49; Halkiotis Dep. II, at 8–12.)

(Mortgage Agreement § 9.)  Saxon contends that this provision allowed it to issue a work order to First American to secure and winterize the property because the First American representative who visited the property on September 16, 2009 reported to Saxon that it was "vacant."[16]

Construing the evidence in the record in the light most favorable to Halkiotis, as I must, I find that a reasonable juror could conclude that Saxon lacked a reasonable basis to believe that the property was abandoned.  *See Fireman's Fund Mortg. Corp. v. Zollicoffer*, 719 F. Supp. 650, 657–59 (N.D. Ill. 1989) (finding mortgagee not liable for trespass when it secured mortgagors' property because the mortgagee "reasonably believed that the Premises were abandoned"); *Njema v. Wells Fargo Bank, N.A.*, No. 13-cv-0519(PSJ), 2015 WL 5008940, at *14–19 (D. Minn. Aug. 18, 2015) (denying summary judgment with regard to a similar trespass claim, despite the mortgagee's showing that it had no control over the third party property inspector's actions in securing the property, because the mortgagee lacked reason to believe the property was abandoned).  The only evidence in the record suggesting that the property was abandoned was First American's report to Saxon that the property was "vacant."  There is no evidence that First American reported that the property was "abandoned."

The remaining evidence in the record suggests that Saxon should have questioned whether the property was actually abandoned.  First, Halkiotis had expressly confirmed to Saxon that the property was owner-occupied only a month earlier.  Second, Halkiotis submitted a full payment to Saxon on September 16, 2008, the *same day* Saxon issued the order to secure and winterize the property – suggesting that he was still seeking to exercise ownership rights over the

---

[16] Saxon also asserts that it had an obligation to secure the property under HUD regulations.  (*See* Def.'s Mem., ECF No. 95, at 23.)  But the regulation at issue only applies to mortgages insured by HUD.  24 C.F.R. § 203.377 ("The mortgagee, upon learning that a property subject to a mortgage *insured under this part* is vacant or abandoned, shall be responsible . . ." (emphasis added)).  Saxon has not pointed to any evidence in the record that the mortgage was insured by HUD.  In any event, even if this regulation applied, it would not alter Saxon's contractual obligation to refrain from securing the property unless the conditions of the Mortgage Agreement were met.

property.  (Anderson Aff. ¶ 47; Def.'s MSJ Ex. 1-D.)  Third, the record fails to provide any

reason *why* First American reported to Saxon that the property was "vacant."  For his part,

Halkiotis suggests that there "was nothing about the Property that was amiss or gave the

impression that it was abandoned: the lawn was well cared for, the house was painted, there were

no broken windows, and the doors were all locked."  (Pl.'s Aff. ¶ 26.)  Finally, Saxon fails to

provide any evidence supporting the reliability of First American's report that the property was

vacant, such as an extensive working relationship between the companies or First American's

experience in this context.

These circumstances differ from those in *Fireman's Fund*, in which the inspection firm

informed the mortgagee that the yard surrounding the property was "unkept," "the telephone and

electrical utilities were disconnected, and a ground level window [was] broken."  719 F. Supp. at

658.  The mortgagors had missed their last four periodic payments, and the mortgagor was even

present at the time the mortgagee's agent secured the property but did nothing to stop it from

doing so.  *Id.*  While the circumstances of this case share some details with *Fireman's Fund*,

such as the fact that Saxon unsuccessfully attempted many times to contact Halkiotis, a

significant difference remains in that there is no evidence describing the condition of the house

or that Saxon lost contact with Halkiotis for a significant amount of time.  Although Saxon failed

to reach him over a period of a few weeks, Halkiotis had confirmed the property was occupied

over the telephone just a month before, and had continued to submit payments, including a full

payment on the same day Saxon issue the work order.  Under these circumstances, a reasonable

juror could find Saxon lacked a reasonable basis to believe Halkiotis had abandoned the property

and thus any basis under the contract to order First American to secure it.

If the jury found that Saxon lacked a reasonable basis to believe the property was abandoned, Saxon could not escape liability by asserting that First American was acting as an independent contractor.  Without a reasonable basis for believing the property was abandoned, Saxon lacked authority under the Mortgage Agreement to enter the property or to hire someone else to do so.[17]  Under those circumstances, an order to First American to secure and winterize the property would be an order to First American to trespass on Halkiotis's property, and would subject Saxon to liability for the acts of First American.  *See, e.g.*, Restatement (Second) of Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another . . . is subject to liability for harm resulting to others from such trespass . . .").  Because a reasonable juror could find that Saxon lacked a reasonable basis to believe the property was abandoned, I deny summary judgment on Count Six.

## IV.    Conclusion

For the reasons stated above, Saxon's motion for summary judgment is GRANTED in part (as to Counts Two, Three, Four, and Five), and DENIED in part (as to part of Count One and as to Count Six).

I am aware that the parties previously met with Magistrate Judge William I. Garfinkel in May 2015 in an unsuccessful effort to settle this case.  I wish to avoid requiring the parties to return to Judge Garfinkel for further mediation unless they both believe it would be productive to do so.  Therefore, the parties shall, within seven days from the date of this ruling, meet and confer regarding whether they wish to return to Judge Garfinkel for mediation.  Should they conclude that they do, they shall file a statement on or before **November 24, 2015**, certifying

---

[17] Saxon does not argue that Halkiotis's failure to pay escrow funds was a sufficient cause under the Mortgage Agreement to entitle Saxon to secure and winterize the property.

that (1) the parties have conferred with each other (through counsel in the case of Saxon), (2) the

parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts

at such mediation in good faith, and (4) Mr. Halkiotis and defense counsel believe that a

mediation stands at least a reasonable chance of resolving the case without trial.  Should either or

both parties not wish to mediate further, no statement need be filed, and the Court will promptly

convene a status conference regarding further proceedings in this case.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
               November 17, 2015